United States District Court
District of Massachusetts

04 12166 RCL

| | |
|---|---|
| FRANK R. SAIA, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>MERCK & CO., INC.,<br><br>Defendant. | Civil Action No. _____<br><br>MAGISTRATE JUDGE Bowler<br><br>**PLAINTIFF DEMANDS A TRIAL BY JURY** |

RECEIPT # 59312
AMOUNT $150
SUMMONS ISSUED: YES
LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
BY DPTY. CLK
DATE 10/14/04

**CLASS ACTION COMPLAINT**

This is an action brought by Plaintiff on behalf of himself and all others similarly situated, who have ingested the non-steroidal, anti-inflammatory pain medication called Vioxx (chemical name "rofecoxib"). This action seeks damages and the establishment of a medical monitoring program on behalf of the Plaintiff and the Class to ensure prompt diagnosis and treatment for Vioxx-related adverse health effects for all class members who acquired and used Vioxx.

**I.    INTRODUCTION**

1.      Plaintiff Frank R. Saia brings this Civil Action for damages and medical monitoring as a result of economic harm suffered from the purchase and use of Vioxx and the increased risk of health problems causally connected to the consumption of Vioxx.

2.      Plaintiff purchased Vioxx and ingested the drug on a regular basis, as prescribed by his physician.

3.      Ingestion of Vioxx has been linked to an increased risk of adverse health effects

-1-

for users, including the increased risk of cardiovascular events such as heart attack and stroke.

4. The Food and Drug Administration ("FDA") approved Vioxx in 1999 for the reduction of pain and inflammation caused by osteoarthritis, as well as for acute pain in adults and for the treatment of menstrual pain. The FDA accelerated the approval process of Vioxx because of a perceived benefit to consumers over the available alternatives at the time, including ibuprofen and naproxen. Subsequently, the FDA approved Vioxx to treat the signs and symptoms of rheumatoid arthritis in adults and children.

5. In June 2000, Merck submitted to the FDA a safety study called VIGOR (Vioxx Gastrointestinal Outcomes Research) that found an increased risk of serious cardiovascular events including heart attacks and strokes, in patients taking Vioxx compared to patients taking naproxen. Defendant attributed these results to a purported "cardio-protective effect" of naproxen.

6. Despite reports over the next few years to the contrary, Defendant continued to maintain that Vioxx did not increase a user's risk of cardiovascular events such as heart attack and stroke.

7. On September 30, 2004, Defendant revealed that Vioxx doubled the risk of heart attack and stroke to consumers who took the drug for longer than 18 months, as compared to subjects taking a placebo. As a result of this revelation, Vioxx was withdrawn from the market worldwide.

8. However, the withdrawal from the market came after Plaintiff Frank R. Saia and other similarly situated class members ingested the drug without notice of the inherent risks to their health. As such, Plaintiff and the Class suffered harm in that their consumer choice was distorted by misleading representations by Defendant, and now Plaintiff and the Class are at an

increased risk of cardiovascular events such as heart attack and stroke and thus require medical monitoring.

## II. PARTIES

9. Plaintiff Frank R. Saia is a resident of the Commonwealth of Massachusetts and acquired and ingested Vioxx.

10. Defendant Merck & Co., Inc. ("Merck" or "Defendant") describes itself as a global research-driven pharmaceutical company which discovers, develops, manufactures and markets a broad range of products to improve human and animal health, directly and through joint ventures. Merck is incorporated under the laws of the State of New Jersey with its principal place of business at One Merck Drive, Whitehouse Station, New Jersey. Defendant was in the business of profiting from the design, manufacture, marketing, distribution and/or sales of the brand-name prescription drug Vioxx.

## III. JURISDICTION AND VENUE

11. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and Defendant and because the amount in controversy exceeds $75,000, exclusive of interest and costs.

12. Venue is properly laid in this district pursuant to 28 U.S.C. § 1391(a) because Defendant was engaged in the business of marketing and distributing Vioxx in the Commonwealth of Massachusetts. In addition, a substantial part of the events giving rise to the claims occurred in this district.

## IV. FACTUAL BACKGROUND

13. At all times relevant, Defendant Merck, itself or by use of others, did research, develop, manufacture, create, design, test, label, sterilize, package, distribute,

supply, market, sell, promote, advertise, and otherwise distribute in interstate commerce, the pharmaceutical product Vioxx.

14.     Vioxx belongs to a class of drugs called "non-steroidal anti-inflammatory drugs," or "NSAIDs." NSAIDs reduce pain by blocking the body's production of enzymes called cyclooxygenase, or "COX," of which there are two forms: COX-1 and COX-2. Most traditional NSAIDs (such as ibuprofen and naproxen) work by blocking the COX-1 enzyme, which reduces pain but may lead to gastroinstestinal perforations and bleeds.

15.     Vioxx, it is believed, blocks the COX-2 enzyme that triggers pain and inflammation while sparing the COX-1 enzyme that helps maintain normal stomach lining. It is indicated for treating the signs and symptoms of osteoarthirtis and rheumatoid arthritis, management of acute pain in adults, and treatment of primary dysmenorrhea.

16.     Vioxx did not promise to be any more effective than traditional NSAIDs, like ibuprofen and naproxen, at treating inflammation and pain. The sole advantage of Vioxx over other NSAIDs was its purported improved safety profile.

17.     Vioxx is a brand name used by Merck to market and distribute rofecoxib. Vioxx was approved for marketing based on information in the New Drug Application submitted by Merck to the FDA. The FDA put Vioxx on a fast-track approval process that lasted approximately 6 months. Defendant obtained FDA approval on Vioxx in or around May of 1999 and began its distribution and sale throughout the United States, including Massachusetts, in May of 1999.

18.     Defendant concealed the serious cardiovascular risks associated with Vioxx because a successful launch of Vioxx was viewed as critical for Merck and safety concerns over hypertension, edema and/or cardiovascular events would have drastically impacted

Merck's positioning in the market as compared to the competing drug, Celebrex (clecoxib), which was placed into the market by Merck competitors Pharmacia and Pfizer some three months prior to the launch of Vioxx.

19. Merck knowingly chose to place these adverse health risks on its consumers despite its knowledge at product launch and in post-marketing data thereafter that use of Vioxx carried significant risk factors. These adverse effects were realized in adverse event reports, in clinical trials adjudicated by primary investigators with Merck's assistance, and in one or more studies shortly after market launch, which showed statistically significant increases in adverse cardiovascular events among Vioxx users.

20. On or about December 16, 1999, the FDA called Defendant to task for its materially false and misleading marketing and promotional materials. The FDA sent Defendant an official letter (the "First FDA Warning Letter") admonishing it that the "promotion pieces...that promoted VIOXX (rofecoxib) ... are false and misleading because they contain misrepresentations of VIOXX's safety profile, unsubstantiated comparative claims, and are lacking in fair balance."

21. In March 2000, Defendant released the results of a Merck-sponsored VIGOR Study, which had begun in or around January of 1999. The VIGOR Study revealed, among other things, "significantly fewer heart attacks were observed in patients taking Naproxen (0.1 percent) compared to the group taking VIOXX 50 mg (0.5 percent) in this study. There was no difference in cardiovascular mortality between the group treated with VIOXX or Naproxen."

22. Defendant attributed the difference in rates of cardiovascular events to the fact that naproxen has "cardio-protective effects," and not to an increased risk of cardiovascular events attributable to Vioxx.

23. In designing the VIGOR Study, Merck took the exceptional step of including an "external Vascular Event Committee (VEC), containing three separate subspecialty committees (cardiac, cerebrovascular, and peripheral), [] for surveillance, monitoring, and adjudication of vascular events occurring in COX-2 inhibitor trials." According to a July 13, 2002 article that appeared in the British medical journal, *The Lancet*, Merck "apparently was aware of possible myocardial toxicity before the [VIGOR] trial, because it set in place a separate adjudication procedure to study the event."

24. While VIGOR did demonstrate that Vioxx reduced the incidence of serious gastrointestinal side effects as compared to naproxen, it did not demonstrate an improved safety profile for Vioxx. The VIGOR data revealed that:

  a. Patients on Vioxx were five times more likely to suffer a heart attack as compared to patients on naproxen;

  b. Patients on Vioxx were 2.3 times more likely to suffer serious cardiovascular disease (including heart attacks, ischemic stroke, unstable angina, and sudden unexplained death) as compared to patients on naproxen;

  c. According to the FDA, "[e]valuation of safety by routine parameters showed no advantege of [Vioxx] rofecoxib over Naproxen; and

  d. Patients on Vioxx actually suffered *more* cases of serious disease (either gastrointestinal or cardiovascular) than did naproxen users (61 and 57 cases respectively).

25. In industry sponsored studies presented at the European United League Against Rheumatism (EULAR), an organization in which Merck is a member and corporate sponsor, in June of 2000, it was shown that Vioxx use resulted in a statistically significant increase in hypertension and myocardial infarction. Merck denied these studies as to the hypertension

problems in the official publication of the American Pharmaceutical Association, Pharmacy Today. (*Spin War Aside, Lessons Emerge From Cox-2 Trials*, August 2000, page 3).

26.     Merck continued to deny the ill health effects associated with Vioxx while at the same time reaping the profits obtained through the non-disclosure. Merck engaged in a massive advertising and sampling program and gained continued increases in market share, which enhanced Merck's financial bottom line. The effect was a more than $2 billion profit for Merck in 2000 and a 23 percent market share.

27.     Merck continued to withhold relevant data from the public throughout the Class Period. For example, in November of 2000, Merck caused the publication of a study in the New England Journal of Medicine and knowingly downplayed and/or withheld from this publication the severity of cardiovascular risks associated with Vioxx consumption over Naproxen consumption.

28.     On February 8, 2001, Merck submitted the results of the VIGOR Study to the FDA Arthritis Advisory Committee as part of Merck's application to modify the prescribing information for Vioxx to reflect the Drug's purported gastrointestinal ("GI") benefits.

29.     In considering the VIGOR Study results, however, the FDA Advisory Committee concluded (in February 2001) Vioxx has no safety advantage over the generic drug naproxen, a drug that sells for a fraction of the cost of Vioxx. According to the *FDA Advisory Committee Briefing Document, VIOXX Gastrointestinal Safety*, dated February 8, 2001: "[I]n the VIGOR Study the potential advantage of decreasing the risk of complicated [GI side effects] was paralleled by the increased risk of developing cardiovascular thrombotic events."

30.     According to a memo prepared by an Advisory Committee member, Lourdes Villalba, M.D., dated February 8, 2001, which discusses the "Overall Safety" of Vioxx, "the

VIGOR Study found there were more overall deaths among Study participants taking Vioxx than those taking naproxen (22 and 15, respectively).

31.  The VIGOR results showed that 50mg doses of Vioxx increased the risk of heart attacks and cardiovascular disease. Faced with this threat to the success of its new blockbuster drug, Defendant offered an unfounded explanation for the negative cardiovascular findings of the VIGOR Study. Defendant asserted that the dramatically increased risk of heart attacks in persons taking Vioxx 50mg was not due to Vioxx; rather, Defendant claimed naproxen was cardio-protective and thus dramatically reduced the risk of heart attacks. Tellingly, the marketers of naproxen have never promoted their drug as being cardio-protective.

32.  On August 22, 2001, the *Journal of the American Medical Association* ("JAMA") published an article authored by cardiologists Eric J. Topol and Steven E. Nessen of the Cleveland Clinic Foundation entitled "*Risk of Cardiovascular Events Associated With Selective Cox-2 Inhibitors,*" which reported the results of a study of Vioxx and Celebrex. The JAMA article reported the findings of the Cleveland Clinic's study that "[c]urrent data would suggest that use of these so-called 'COX-2 inhibitors' might lead to increased cardiovascular events."

33.  The day before the JAMA article was published, *Bloomberg News* reported that Merck commented, with regard to the article, "We have additional data beyond what they cite, and the findings are very, very reassuring. Vioxx does not result in any increase in cardiovascular events compared to placebo." Further, on August 23, 2001, the day after the article was published, Merck stated in a press release, "the Company stands behind the overall and cardiovascular safety profile...of Vioxx."

34.  In a follow-up study reported in the Journal of the American College of

-8-

Cardiology on or about February 6, 2002, Dr. Richard J. Bing conducted scientific testing and confirmed that the Cox-2 inhibitor tips the balance of prostacyclin/thromboxane in favor of thromboxane, leading to increased vascular and thrombotic events.

35.     In September 2001, the FDA sent Defendant another warning letter (the "Second FDA Warning Letter") which again warned Defendant that Merck's marketing of VIOXX was "false, lacking in fair balance, or otherwise misleading..." The Second Warning Letter went on to advise Defendant that Merck's marketing "minimize[s] the potential serious cardiovascular findings that were observed in the VIGOR Study, minimize[s] the VIOXX/Coumadin drug interaction, omit[s] crucial risk information associated with VIOXX therapy, contain[s] unsubstantiated comparative claims, and promote[s] unapproved uses."

36.     The Second Warning Letter also reprimanded Merck for:

> "assert[ing] that Vioxx does not increase the risk of [heart attacks] and that the VIGOR finding is consistent with naproxen's ability to block platelet aggregation like aspirin. That is a possible explanation, but you fail to disclose that your explanation is hypothetical, has not been demonstrated by substantial evidence, and that there is another reasonable explanation, that Vioxx may have pro-thrombotic properties."

37.     Defendant denied reports concerning the increased risk of cardiovascular problems as inaccurate and inconclusive. For example, on May 22, 2001, Merck issued a press release through the *PR Newswire* that stated, among other things: "In response to news and analyst reports of data the Company first released a year ago, Merck & Co., Inc. today reconfirmed the favorable cardiovascular safety profile of Vioxx."

38.     The theory that naproxen had a cardioprotective effect and therefore accounted for the higher cardiovascular risks among Vioxx users was debunked in approximately January of 2002 by a Vanderbilt University School of Medicine human epidemiologic peer-reviewed

study. The study was published in *The Lancet*, and concluded that there is an absence of a protective effect of naproxen or other non-aspirin non-steroidal anti-inflammatory drugs on risk of coronary heart disease. Ray, W., et. al., *Non-Steroidal Anti-Inflammatory Drugs and Risk of Serious Coronary Heart Disease: An Observational Cohort Study*, The Lancet, 359: 118-123, Jan. 12, 2002.

39.     The FDA's Adverse Reporting System ("AERS") database is a computerized system for collecting and maintaining information about adverse events reported by drug manufacturers, health professional, and others. The system contains adverse events detected and reported after marketing of the drug.

40.     According to AERS, through October of 2003, almost 2,000 adverse cardiovascular events were experienced by persons taking Vioxx, including myocardial infarctions, cardiac arrests, and cardiac failures. These cardiac events reported to the FDA, which, according to some measures, represent underreporting of as much as 99%, resulted in such outcomes as hospitalization, life threatening conditions, and even death.

41.     On October 22, 2003, *Reuters* published an article that stated "arthritis drug is suffering from clinical trial data suggesting it might slightly raise the risk of heart attacks, and the growing perception that its pain-fighting capabilities are no better than traditional painkillers."

42.     On October 30, 2003, in an article entitled "Vioxx Study Sees Heart-Attack Risk," *The Wall Street Journal* reported that another study, sponsored by Merck, presented at the annual meeting of the American College of Rheumatology, confirmed an increased "risk of heart attacks in patients taking the pill [Vioxx]." According to *The Wall Street Journal* article, within the first 30 days of taking Vioxx, the risk of a heart attack was increased 39% as

compared to Vioxx's competitor, Celebrex.

43. At all times relevant to this litigation, Defendant Merck had a significant market share based upon claims of Vioxx's efficacy, a very aggressive marketing program which involved financial incentives to sales teams, infusion of some 700 new sales representatives, and a massive advertising and sampling program.

44. If Defendant had not engaged in this conduct, consumers, including Plaintiff, would have known the true risks of ingesting Vioxx and would have switched from Vioxx to safer products or refrained wholly from its use.

45. The marketing strategies of the Defendant targeted Plaintiff and the other Class members to induce them to purchase Vioxx. At the time the Defendant distributed, manufactured and marketed Vioxx, Defendant intended that Plaintiff would rely on the marketing, advertisements and product information propounded by Defendant, as well as Defendant's omission of relevant negative information from such materials.

46. From the initial marketing of Vioxx until April 2002, the safety label for Vioxx set forth an explicit warning concerning "Gastrointestinal (GI) Effects." Specifically, the safety label warned of the "Risk of GI Ulceration, Bleeding, and Perforation." Nowhere within the safety label did Defendant make full or adequate disclosure of the cardiovascular safety issues related to Vioxx.

47. After reviewing the results of the VIGOR study and other available data from controlled clinical trials, the FDA consulted with its Arthritis Advisory Committee. In April 2002, pursuant to the review by the FDA and resultant instructions, Merck implemented labeling changes for Vioxx to reflect the findings from the VIGOR study. The labeling changes included information about the occurrence of cardiovascular events, including heart

-11-

attack and stroke, in some patients. At no time did the safety label disclose the level of risk that consumers were subjected to as a result of their ingestion of Vioxx. In fact, Merck continued to stand by the "safety profile" of Vioxx.

48. The April 2002 labeling changes were insufficient to put the consuming public on notice of the extent of the risk of adverse health effects that use of Vioxx presented.

49. Thus, despite knowledge in its clinical trials and post-marketing reports, studies and information relating to cardiovascular-related adverse health effects, Defendant promoted and market Vioxx as safe and effective for persons such as Plaintiff and members of the Class.

50. Merck failed to reveal the true connection between use of Vioxx and cardiovascular events until September 30, 2004.

## CLASS ACTION ALLEGATIONS

51. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(2) and/or (b)(3), on behalf of a Class consisting of all persons who acquired and ingested Vioxx from May 21, 1999 to September 30, 2004, inclusive. Excluded from the Class are the affiliates and subsidiaries of the Defendant, the officers and directors of the Defendant; members of the immediate family of any excluded person, the legal representatives, heirs, successors and assigns of any excluded person, and any entity in which any excluded person has or had a controlling interest.

52. The members of the proposed Class are geographically disbursed throughout the United States and Massachusetts, and are so numerous that joinder of all of them is impracticable.

53. Plaintiff's class claims are typical of Class members' claims because each Class member was subject to a common course of conduct and pattern of practice perpetrated by

Defendant.

54.     No conflict exists between Plaintiff and Class members because: (a) the claims of the named plaintiff are typical of the absent Class members' claims, (b) virtually all of the questions of law or fact at the liability stage are common to the class and predominate over any individual issues, such that by prevailing on her own claims, Plaintiff necessarily will establish Defendant's liability as to all class members, and (c) without the representation provided by Plaintiff herein, few class members will receive legal representation or redress for their injuries.

55.     Plaintiff can and will fairly and adequately represent and protect the interests of the class and has no interests that conflict with or are antagonistic to the interests of the Class. Plaintiff has retained attorneys competent and experienced in class action litigation, consumer law and product liability.

56.     There are issues of law common to the Class which predominate over any individual issues in the claims, including, but not limited to:

    a.    Whether Defendant designed, manufactured and/or marketed Vioxx with knowledge that it was a dangerously defective product;

    b.    Whether Defendant acted negligently in marketing and selling Vioxx;

    c.    Whether Defendant conducted, either directly or indirectly, adequate testing of Vioxx;

    d.    Whether Defendant failed to adequately warn consumers of the adverse health hazards caused by using Vioxx;

    e.    Whether Defendant falsely and fraudulently misrepresented in their advertising, promotional materials and other materials, among other things, the safety of using Vioxx;

    f.    Whether Defendant knowingly omitted, suppressed or concealed material facts about the unsafe and defective nature of Vioxx from

       governmental regulators, the medical community and/or the consuming public;

g.    Whether Defendant's conduct constituted an unfair, deceptive and/or unconscionable trade practice;

h.    Whether Defendant's conduct constituted the knowing or intentional concealment, suppression or omission of material information intended to be relied upon by others in connection with the sale of Vioxx;

i.    Whether Defendant's actions support a cause of action for medical monitoring;

j.    Whether medical monitoring of Plaintiff and the Class who used Vioxx is reasonable necessary;

k.    Whether the class is entitled to a return of the purchase price of Vioxx or other such relief.

57.    Virtually all of the issues of fact in the class claims are common to the Class and predominate over any individual issues in the class claims.

58.    A class action is superior to any other available method for the fair and efficient adjudication of this count, given that:

    a.    common questions of law and fact overwhelmingly predominate over any individual questions that may arise, such that there would be enormous economies to the courts and to the parties in litigating the common issues on a class-wide basis as opposed to a repetitive, individual basis, which could result in conflicting judgments and obligations for the parties;

    b.    the size of each Class member's individual damage claim typically is too small to make individual litigation against Defendant an economically viable alternative;

    c.    despite the relatively small size of individual Class members' claims, their aggregate volume, coupled with the economies of scale inherent in litigating similar claims on a common basis, will enable this case to be litigated as a class action on a cost-effective basis, especially when compared with the burden on the courts and the parties of conducting myriad individual litigations; and

       d.      no unusual difficulties are likely to be encountered in the management of this action as a class action.

Class certification is also appropriate pursuant to Federal Rule of Civil Procedure 23(b)(2) because Defendant has acted on grounds generally applicable to the Class, making appropriate equitable injunctive relief with respect to Plaintiff and the Class members. Specifically, Plaintiff seeks injunctive relief in the form of court-ordered medical monitoring and treatment of medical conditions which may befall those who used Vioxx.

## COUNT I
## (Fraud)

59.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

60.    Defendant intentionally employed deceptive representations as to the risks and side effects of Vioxx in the marketing, promotion and sale of the drug to consumers, as set forth above.

61.    Defendant's conduct included the issuance of the false and misleading representations and omissions of material facts regarding Vioxx's capabilities and the side effects of Vioxx upon which Plaintiff and the other members of the class relied.

62.    Defendant failed to sell Vioxx in the manner and of the nature advertised or offered, and was unable to provide Vioxx in accordance with other terms or conditions.

63.    The fraudulent practices of Defendant have directly, foreseeably, and proximately caused damages and injury to Plaintiff and the Class.

64.    Defendant's conduct caused Class members to acquire and ingest Vioxx.

65.    By reason of Defendant's unlawful conduct Plaintiff and the Class have suffered losses and are entitled to damages as defined in the statute, including exemplary damages, the

return of consideration paid and attorneys' fees, as specified therein.

## COUNT II
## (Medical Monitoring)

66. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

67. As a direct and proximate result of Defendant's acts and omissions as set forth herein, Plaintiff and the members of the Class were exposed to a hazardous substance and, as a result, suffer a significantly increased risk of contracting further serious injury or latent disease, including heart attack and stroke. This increased risk makes periodic diagnostic and medical examination reasonable and necessary. Easily administered, cost-effective monitoring and testing procedures exist which make the early detection and treatment of such injuries or disease possible and beneficial.

68. The recommended testing and monitoring procedures will be subject to expert testimony at the time of trial.

69. The increased susceptibility to injuries and irreparable threat to the health of Plaintiff and the Class resulting from their exposure to Vioxx can only be mitigated or addressed by the creation of a comprehensive medical monitoring program.

70. Plaintiff and the Class have no adequate remedy at law in that monetary damages alone cannot compensate for the continuing nature of the harm to them, and a monitoring program which notifies them of possible injury and aids in their diagnosis and treatment can prevent the greater harms which may not occur immediately and which may be preventable if proper research is conducted and the health risks are diagnosed and treated before they occur or worsen.

71. The susceptibility of Plaintiff and other Class members to heart attacks, strokes and other disorders is a result of their use of Vioxx. Early detection and diagnosis of these conditions is clinically invaluable because it can prevent and/or significantly delay resulting pain, suffering and/or death.

72. Without a court-approved and supervised medical monitoring program, Plaintiff and the Class will not receive prompt medical care which could detect injury and disease and prolong their productive life, increase prospects for improvement and minimize disability.

## COUNT III
### (Unjust Enrichment)

73. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

74. As a direct, proximate, and foreseeable result of Defendant's acts and otherwise wrongful conduct, Plaintiff and the Class were economically harmed. Defendant profited and benefitted from the sale of Vioxx, even as Plaintiff and the Class suffered this harm.

75. Defendant has voluntarily accepted and retained these profits and benefits, derived from consumers with full knowledge and awareness that, as a result of Defendant's unconscionable and intentional wrongdoing, consumers, including Plaintiff, were not receiving products of the quality, nature, fitness, or value that had been represented by Defendant or that reasonable consumers, expected. Plaintiff and the Class purchased medicine that they expected would improve their health, and instead found their health negatively affected.

76. By virtue of the conscious wrongdoing alleged in this Complaint, Defendant has been unjustly enriched at the expense of Plaintiff and the Class, who are entitled to in equity, and hereby seek, the disgorgement and restitution of Defendant's wrongful profits, revenue,

and benefits, to the extent, and in the amount, deemed appropriate by the Court; and such other relief as the Court deems just and proper to remedy Defendant's unjust enrichment.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

1. For general damages in a sum in excess of the jurisdictional minimum of this Court;

2. Pre-judgment and post-judgment interest as provided by law;

3. Full refund of all purchase costs Plaintiff and the Class paid for Vioxx;

4. Compensatory damages in excess of the jurisdictional minimum of the Court, according to proof;

5. Consequential damages in excess of the jurisdictional minimum of the Court, according to proof;

6. Punitive and exemplary damages. In support of said damages, Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

    (a) Plaintiff is entitled to punitive damages because Defendant acted with malice and/or intentional and reckless indifference to Plaintiff's safety and well being. Defendant misled both the medical community and the public at large, including Plaintiff and the Class, by making false and misleading representations about the safety of Vioxx and failing to reveal relevant, negative information. Defendant understated and/or disregarded their knowledge of the serious and permanent adverse effects associated with the use of Vioxx despite available information demonstrating that their product was likely to cause serious, and sometimes, fatal side effects to users, like Plaintiff and other members of the Class.

    (b) Defendant was or should have been in the possession of evidence demonstrating that Vioxx caused serious adverse reactions. Nevertheless, Defendant continued to market Vioxx by providing false and misleading information as to the safety of the product to government officials, the medical community and the public.

    (c) Accordingly, punitive damages are warranted, and should be awarded to Plaintiff as determined at trial.

7. Attorneys' fees, expenses, and costs of this action;

8. Disgorgement of all profits associated with Vioxx;

9. Injunction requiring Defendant to fund a medical monitoring program to address the needs of the Class associated with the use of Vioxx; and

10. Such further relief as this Court deems necessary, just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY.**

Dated: October 13, 2004

_____

Stephen V. Saia, BBO #562009
**Law Offices of Stephen V. Saia**
70 Old Cart Path Lane
Pembroke, MA 02359
(781) 826-8401

*Of Counsel*
Jacob B. Perkinson
James F. Conway, III
**Johnson & Perkinson**
P.O. Box 2305
1690 Williston Road
South Burlington, VT 05403
(802) 862-0030